Filed 10/6/20  In re A.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. |  |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E074741 |
| Plaintiff and Respondent, | (Super.Ct.No. J282500) |
| v. | OPINION |
| D.C., |  |
| Defendant and Appellant. |  |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

D.C. (mother) appeals the juvenile court's dispositional order removing her daughter, Ariana, from her custody and denying reunification services. Mother argues the order is not supported by sufficient evidence. We affirm.

I

FACTS

Mother is a single parent with three young children. Ariana is the youngest. She and her sister, Ava, share the same presumed father, R.A. (father). The two sisters also have a half brother with a different presumed father. In August 2019, Ava was two years four months old and Ariana was 15 months old.

San Bernardino County Children and Family Services (CFS) first opened a case against mother in 2017, immediately after Ava's birth. Shortly after delivery, nurses observed father verbally abusing mother. The paternal grandmother also tried to attack the maternal grandmother at the hospital. A social worker questioned mother, who told the social worker about domestic violence incidents between herself and father. CFS opened a dependency case as to Ava and her half brother based on allegations mother and father abused substances and physically abused, neglected, and failed to protect the children. In particular, CFS noted "mother had previously failed to supervise and protect [Ava and her half brother] from the conduct of [father] . . . , which included hitting . . . Ava on the arm, head, and back with a hanger," and both children "had been exposed to multiple incidents of domestic violence in the home including pushing, shoving, choking and arm grabbing."

2

Once CFS became involved, mother attempted to document the abuse by calling the police after the incidents of domestic violence, doing so three different times. According to mother, after such incidents father would sometimes lock her in a room or closet. Once she escaped, she would call the maternal grandmother, and stay out of the home she shared with father for about two months before returning.

Mother, father, and Ariana's half brother's father were offered reunification services. The court ultimately terminated services for both fathers for failing to make sufficient progress on their case plans. Mother completed her case plan, which included domestic violence classes, parenting education classes, counseling services, and outpatient services. According to CFS, mother "previously had a substance abuse problem," but had, as of October 2019, "recently completed outpatient treatment." CFS offered mother family maintenance services, and Mother was completing them at the time of the incident giving rise to this case.

As of August 2019, mother and father were " 'not really' " in a relationship and were living separately. Mother told CFS they would " 'talk here and there' " and that she would try to get him to go to classes without success.

On August 5, 2019, Ariana and Ava were at their paternal grandmother's house for a visit with father. This was despite the fact that all visits between Ava and father were supposed to be supervised and take place at CFS's offices. Mother told CFS she received a text from father saying he hurt Ava's arm. Mother called father. According to mother, father told her he thought he broke Ava's arm while swinging her. Father told the

3

maternal grandmother he only pulled Ava's arm out of place. Father later told CFS Ava fell and hurt her arm, and denied telling mother he thought he broke it, though CFS noted father "was avoiding certain questions . . . and when he did answer, [the interviewer was] not sure if it was an honest response."

In response to father's call, mother went to the paternal grandmother's house and demanded father turn over custody of both Ariana and Ava. He allowed her to take Ariana, but refused to give her Ava. Mother refused to leave without Ava, but Ariana left with one of mother's friends. Mother and the paternal grandmother yelled at each other on the front lawn of the home. Eventually, the paternal grandmother threw a skateboard at mother before running back to the front door. Mother responded by breaking both of the home's front windows. Ava stayed inside the house throughout the incident.

The paternal grandmother called the police. Police arrived and arrested mother for vandalism (Pen. Code, § 594, subd. (b)(1).) When the police released her the next day, mother went straight to CFS to report what happened. When CFS asked why she hadn't called the police herself, "she stated that she had called [the police] on the father three other times, so she 'found calling them was no use.' " Ava was taken to the hospital, where she was diagnosed with nursemaid's elbow, which is a condition where the elbow shifts out of its normal position and normally affects young children under seven.

Two days after the incident, the police responded to another call from the paternal grandmother's home. The caller reported that mother's boyfriend, who the caller believed to be armed with a firearm, was at the house yelling. Father told police the boyfriend

kicked in the front door and brandished a gun before fleeing in a car with mother driving. CFS had not assessed mother's boyfriend to be around the children.

On September 17, 2019, CFS filed a petition under section 300, subdivisions (b) and (j), as to Ariana. The petition alleged mother failed to protect Ariana in violation of section 300, subdivision (b), and that Ariana's sibling was abused or neglected "and there is a substantial risk" Ariana would be abused or neglected as well in violation of subdivision (j). In support of the alleged subdivision (b) violation, CFS alleged the August 5 incident was an act of domestic violence by mother against father. The petition further alleged that mother "has a history of substance abuse that hinders her ability to care for" Ariana. In support of the alleged subdivision (j) violation, the petition alleged father "failed to reunify with . . . Ava . . . which places Ariana at risk of abuse and/or neglect." Finally, CFS alleged mother knew father had previously abused Ava, and therefore failed to protect Ariana by leaving her with father. CFS recommended Ariana be detained and placed in confidential foster care. CFS also filed section 387 supplemental petitions as to Ava and the half brother in their ongoing dependency case.

The court held the detention hearing the following day. Mother and father were present and denied the allegations in the petition. The court found a prima facie case Ariana came within section 300 and followed CFS's recommendation, detaining her in CFS's care. It set a jurisdiction and disposition hearing for October 9, 2019.

On October 8, 2019, CFS submitted an amended petition which added allegations in support of its two main contentions. The petition alleged there was substantial risk

Ariana would "suffer serious physical harm inflicted non-accidentally" due to both mother and father engaging in domestic violence "in the presence of the child." It also alleged Ariana was at risk for abuse under section 300, subdivision (j), because mother had "a history of engaging in numerous domestic violence acts, in the presence of" her children. The petition alleged mother had been "hit, pushed, shoved, choked, and grabbed by [father]."

On October 9, 2019, the court set a new jurisdiction and disposition hearing for December 4, 2019. At the hearing, the court dismissed the allegation that mother had a history of substance abuse hindering her ability to parent Ariana. It found all other allegations true, and found Ariana fell within section 300, subdivisions (b) and (j). The court continued the contested disposition hearing to January 30, 2020.

On January 30, 2020, CFS filed additional information with the court. The report indicated mother was visiting the children regularly, had missed two drug tests, and had tested clean for four others. She voluntarily began taking domestic violence classes and had completed five as of the report date.

At the hearing in Ava and her half brother's case, mother requested the children be returned to her custody. The court disagreed, finding there was clear and convincing evidence the children faced a substantial risk of danger to their physical health and safety if they remained in her care. The court then terminated reunification services as to the half brother and Ava and ordered them removed from mother's custody. Turning to Ariana's case, the court also found clear and convincing evidence that Ariana could not

6

safely remain in mother's custody. The court removed Ariana from mother and denied her reunification services. Specifically, it found the bypass provision in section 361.5, subd. (b)(10), applied—that is, the court had terminated reunification services as to Ariana's siblings because mother failed to reunify with them and that she had not made subsequent reasonable efforts to treat the problems leading to removal.

Mother timely appealed.

II

ANALYSIS

Mother argues there is insufficient evidence to support the dispositional order removing Ariana from her care. Specifically, she argues there was insufficient evidence Ariana faced a substantial risk of danger in her care or that there were no less restrictive means to protect her. (§ 361, subd. (c)(1).)

"Before the court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, the minor would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. . . . The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

In determining whether to remove a child from a parent's custody, "[t]he court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home." (§ 361, subd. (e).) "To aid the court in determining whether 'reasonable means' exist for protecting the children, short of removing them from their home, the California Rules of Court require [CFS] to submit a social study which 'must include' among other things: 'A discussion of the reasonable efforts made to prevent or eliminate removal.' " (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.)

"We review the court's dispositional findings for substantial evidence." (*In re T.V.* (2013) 217 Cal.App.4th 126, 136.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' [Citation.]" ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Here, CFS argues the alleged risk of harm to Ariana is twofold—there is the risk she might suffer physical or emotional harm by being exposed to domestic violence between her parents, as well as the risk father may physically abuse her. There is little dispute that actual physical abuse constitutes a substantial risk of harm. However, exposure to domestic violence "in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.) CFS argues mother's behavior demonstrates she is unwilling or unable to protect her children from domestic violence or from father's physical abuse.

We agree. Having reviewed the evidence in the light most favorable to the court's dispositional order, we conclude the order is sufficiently supported by the record. Setting aside for a moment mother's long history of being a victim of father's domestic violence, the August 5 incident supports an inference that she doesn't appreciate the threat father poses to her children and also that *she herself* poses a threat. Even after CFS had to intervene because of father's domestic violence and extreme corporal punishment of Ava, and even after her own domestic violence counseling, mother allowed father to have unsupervised visits with Ariana and Ava. That this resulted in father injuring one of the children was an unfortunate and predictable outcome. Additionally, mother's own violent outburst shows that though father may be the primary abuser, she is also willing to engage in domestic violence while her children are nearby. That she had at least this one

9

lapse in judgment, despite her training, presents a risk she will have another. Indeed, the record contains evidence that she *did* have another lapse in judgment when she accompanied her boyfriend to father's house two days after the brick-throwing incident. The court was free to credit father's statement to the police that the boyfriend was brandishing a gun. These two incidents, on their own, provide sufficient support for the conclusion that mother posed a significant risk to the children's physical and emotional wellbeing.

Once such a risk of harm is identified, the court must find "there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent[]." (§ 361, subd. (d).) "Removal on any ground not involving parental rejection, abandonment, or institutionalization requires a finding that there are no reasonable means of protecting the child without depriving the parent of custody." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) Out-of-home placement is a "last resort, to be considered only when the child would be in danger if allowed to reside with the parent." (*Id.* at p. 525.) In addition, "Section 361, subdivision (c), requires the trial court to (1) determine if reasonable efforts had been made to prevent or eliminate the need for removing the minor from his or her home and (2) to state on the record the facts that led the court to order removal." (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 171, superseded by statute on another point, as noted in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239-1242.) Failure to do so is error. (*In re Basilio T.*, at p. 171.)

Substantial evidence supported the court's finding that no reasonable means existed to protect Ariana short of removal. The court found that section 361.5, subdivision (b)(10), applied to Ariana. That provision allows a court to forego offering reunification services when "the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling . . . and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling." (§ 361.5, subd. (b)(10).) Thus, the decision to remove Ariana and not to provide reunification services is linked to the court's decision to do the same with regards to the older children.

The court terminated services as to the older two children because it found the previous disposition was not effective in protecting them, that reasonable means were attempted to protect them, and there remained a substantial risk of danger in returning them to mother's care. These conclusions are supported by substantial evidence. The central issue identified in both the older children's dependency and Ariana's dependency was their exposure to domestic violence and their exposure to father. By mother's own admission, during the older two children's dependencies she would leave father for only temporary periods before eventually returning. Though we are sympathetic that a cyclical pattern of abuse is unfortunately a common feature of domestic violence, mother's failure to break this cycle put her children at risk. She eventually made progress by no longer living with father and apparently ending her relationship with him. But the August 5

11

incident demonstrates that progress was short-lived. Not only did she allow father to have unsupervised visits with Ava, she exposed Ava to domestic violence when she arrived to retrieve her. Mother's behavior during that incident is evidence enough that the previous disposition had not effectively protected Ava. Thus, the court's decision that returning Ava and her half brother to mother was against their interests is supported by the record.

Moreover, once the court determined returning the older two children to mother was against their interests, mother's time had run out for any options other than termination of reunification services. Mother was first referred to CFS on April 12, 2017, and first given reunification services for the older two siblings on November 2, 2017. By the time of the disposition hearing on January 30, 2020, the older two siblings' dependency case had been open for over two years. Section 366.22 requires the court to return children to the parents' custody within 18 months of removal unless "the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) The court may only extend this to 24 months under certain circumstances. (§ 366.22, subd. (b).) Here, the trial court correctly concluded "that as to [the half brother] and Ava the reunification time has expired and that we're well beyond the .22 date. I believe we're well beyond two years at this point." Because of this, the court was also correct in concluding "there's not a substantial probability of return [for Ava and her half brother] to either of their parents . . . and that, again, we're well beyond the statutory time frames."

Because substantial evidence supported the court's decision to terminate services as to the older two children, the only remaining question with regards to Ariana was whether mother "made a reasonable effort to treat the problems that led to removal of the sibling or half sibling." (§ 361.5, subd. (b)(10).) However, since the two dependency proceedings here overlap, all the same facts supporting mother's failure to reunify with her older two children also support a finding against her on this question. There was no period after the termination of services as to the older two children where mother could have demonstrated additional efforts to improve. The same facts which demonstrated she hadn't adequately addressed the problems which led to the removal of her older two children also support the court's decision not to offer services as to Ariana. Accordingly, the court's decision to remove Ariana from mother's custody and not offer reunification services was supported by substantial evidence.

## III

## DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
                                                                J.

We concur:


RAMIREZ
            P. J.


McKINSTER
            J.


13